# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

EDGAR CALIN, individually and on behalf of all others similarly situated,

　　　　　　Plaintiff,

　　v.

MICHAEL R. DAVIN, BRIAN M. BAREFOOT, ETTORE V. BIAGIONI, WILLIAM O. FLANNERY, MARINA HATSOPOULOS, THOMAS H. ROBINSON, HOLOGIC, INC., AND MINUTEMAN MERGER SUB, INC.

　　　　　　Defendants.

Case No.

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff Edgar Calin ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

## SUMMARY OF THE ACTION

1.　　This is a stockholder class action brought by Plaintiff on behalf of all holders of the Class A common stock of Cynosure, Inc. ("Cynosure" or the "Company") against the board of directors of the Company (the "Board" or "Individual Defendants") to enjoin the proposed acquisition of the Company by Minuteman Merger Sub, Inc. ("Merger Sub" or "Purchaser"), a wholly owned subsidiary of Hologic, Inc. ("Hologic" or "Parent"), pursuant to which Merger Sub will launch a tender offer to acquire all of the Company's outstanding Class A common stock (the "Proposed Transaction").

2.　　On February 14, 2017, Cynosure entered into an agreement and plan of merger (the

"Merger Agreement") whereby Merger Sub will acquire all of the outstanding Class A common stock of Cynosure for $66.00 per share in cash (the "Offer Consideration" or "Offer Price"). Following the consummation of the Merger Agreement, Purchaser will merge with and into Cynosure, with Cynosure surviving as a wholly owned subsidiary of Hologic.

3.     The process by which Defendants agreed to the Proposed Transaction is fundamentally unfair to Cynosure's public stockholders because the Defendants rushed through negotiations and accepted the Offer Consideration from Parent without waiting to ensure that Party B would not submit a superior offer.

4.     Moreover, the officers and directors had conflicts of interest because, upon the consummation of the Proposed Transaction, they stood to receive large sums of cash for their shares, stock options, restricted stock units ("RSUs") and performance stock units ("PSUs").

5.     Finally, the Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") filed with the U.S. Securities and Exchange Commission ("SEC") on February 22, 2017 was materially misleading, in that the Company failed to disclose critical information regarding the Company's projections and how those projections were formulated, as well as important information regarding the sales process.

6.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Individual Defendants' breaches of their fiduciary duties of loyalty and care.

## PARTIES

7.     Plaintiff is and has been at all material times a public stockholder of Cynosure.

8.     Non-party Cynosure is a Delaware corporation with its principal executive offices located at 5 Carlisle Road, Westford, MA 01886.  Cynosure stock trades on the NASDAQ GS under the ticker symbol "CYNO."

9.     Defendant Michael R. Davin ("Davin") has been Cynosure's chief executive officer ("CEO") since September 2003. Davin was President of the Company from September 2003 to July 2014, and was reappointed in May 2016.

10.     Defendant Brian M. Barefoot ("Barefoot") has been a director of the Company since 2011. Barefoot is a member of the Compensation Committee and Chair of the Audit Committee.

11.     Defendant Ettore V. Biagioni ("Biagioni") has been a director of the Company since 2005.

12.     Defendant William O. Flannery ("Flannery") has been Lead Director of the Company since January 2015.

13.     Defendant Marina Hatsopoulos ("Hatsopoulos") has been a director of the Company since 2008.

14.     Defendant Thomas H. Robinson ("Robinson") has been a director of the Company since 2005. Robinson has been chairman of the Compensation Committee since joining the Board.

15.     Defendants Davin, Barefoot, Biagioni, Flannery, Hatsopoulos and Robinson are collectively referred to herein as the "Board" or the "Individual Defendants."

16.     Defendant Hologic is a Delaware Corporation.

17.     Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Hologic.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14(e).

2.     Venue is proper in this Court because the Defendants reside, are found, have agents and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).  The Company's headquarters are located at 5 Carlisle Road, Westford, MA 01886.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Cynosure Class A common stock as of February 14, 2017, the date the Proposed Transaction was announced, and their successors in interest, except Defendants and their affiliates (the "Class"). This action is properly maintainable as a class action for the reasons set forth below.

19.     The Class is so numerous that joinder of all members is impracticable. As of February 10, 2017, the Company had approximately 23.77 million shares of Class A common stock issued and outstanding.

20.     Questions of law and fact are common to the Class, including:

    i.   Whether the Individual Defendants are unjustly enriching themselves and other insiders or affiliates of Cynosure;

    ii.   Whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other strategic alternatives, including offers from interested parties for the Company or its assets;

iii.   Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiffs and the other members of the Class;

iv.   Whether the Individual Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

v.   Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

vi.   Whether Plaintiff and the other members of the Class would be irreparably harmed were the Proposed Transaction complained of herein consummated; and

vii.   Whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct;

21.   Plaintiff's claims are typical of those of the other members of the Class.

22.   Plaintiff is an adequate representative of the Class because he has no interests that are adverse to the Class, is committed to prosecuting this action, and has retained competent counsel experienced in litigation of this nature.

23.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants. Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

24.   The party or parties opposing the Class has acted or refused to act on grounds

generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

25.     Cynosure is a developer and manufacturer of light-based aesthetic and medical treatment systems which are used to provide various treatment applications, including hair removal, skin revitalization and scar reduction, and vascular lesion treatment. The Company currently holds 37 U.S. patents and markets more than 14 different light based systems, and its products are used by aesthetic and medical professionals worldwide.

26.     On February 7, 2017, the Company announced its financial results for the fourth quarter of 2016. The Company reported fourth quarter 2016 revenue of $122 million, a 19 percent increase year-over-year. North American product revenue increased 24% to $69.5 million, while international product revenue increased 12% to $33.2 million. The Company also reported that its 2016 annual revenue was $433.5 million, which marked a record-high and a 28% increase from 2015.

27.     In the press release announcing the financial results, Defendant Davin, Cynosure President and CEO, commented on the Company's performance, stating

> We capped an outstanding year with a strong fourth quarter, as revenue increased 19 percent year-over-year to a quarterly record $122.1 million. The fourth quarter of 2016 marked our 28th consecutive quarter of year-over-year top-line growth, an accomplishment that demonstrates the enduring strength and consistent quality of our product portfolio. We continue to lead the aesthetic device industry by focusing on innovation, execution and growth. The 23 percent compound annual top-line growth we've achieved over the past five years reflects our ability to cultivate the right organic opportunities, make disciplined strategic investments and maintain a solid financial model.

Commenting on Cynosure's business outlook, Davin stated,

We begin 2017 with a high degree of optimism, confident that we have the right product portfolio, technology and distribution to capitalize on the trends that will shape the aesthetic market in the quarters and years ahead," Davin said. "Our strategy positions us to generate sustained growth from diverse revenue sources, drive long-term profitability and deepen our competitive advantage.

### The Flawed Sale Process

28.    The Proposed Transaction is the result of a flawed process whereby the Individual Defendants subverted the interests of Plaintiff and the other public stockholders of the Company, constituting a breach of their fiduciary duties.

29.    The sales process began in October 2015, when the Company's senior management, with authorization from the Board, began meeting with private equity firms to gauge the potential for interest in a strategic transaction. These meetings continued through January 2016.

30.    On February 3, 2016, the Board instructed management to work with Leerink Partners LLC ("Leerink") to identify industry participants most likely to be interested in a strategic transaction with the Company.

31.    On March 17, 2016, Leerink and the Company's management met and discussed building relationships with larger aesthetic and diversified device companies, at which time Leerink suggested several potentially strategic parties. Following the meeting, at the direction of the Company, Leerink asked five industry participants whether they would be interested in entering into a confidentiality agreement and learning more about the company. One of these companies ("Party A"), expressed interest in meeting with the Company and signed a confidentiality agreement on May 18, 2016, which did not include a standstill provision. The other four companies that Leerink contacted declined to meet with the Company.

32.    In October 2016, a Leerink representative spoke with Stephen MacMillan ("MacMillan"), the CEO of Parent, at which time MacMillan indicated an interest in learning more

about the Company and requested a meeting with Davin.

33.     On November 2, 2016, MacMillan met with Davin privately and informed Davin that, although Parent was not pursuing acquisitions at that time, Davin should consider contacting Parent if the Company were to ever pursue a sale.

34.     On December 4, 2016, representatives of Party A met with Davin, at which time the representatives advised Davin that a transaction with Party A might need to address associated antitrust risks.

35.     At a special meeting on December 7, 2016, the Company's legal counsel, Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") advised the Board, and the Board agreed, that Davin should not engage in discussions of employment or compensation arrangements for himself or other members of management with Party A or any other interested party until the Board had determined to proceed with a particular party and the economic terms of the transaction had been settled. It should be noted that this decision was made after Davin met privately with both MacMillan and representatives from Party A, and the Recommendation Statement fails to indicate whether Davin engaged in any discussions of employment or compensation arrangements at these private meetings.

36.     On December 19, 2016, after Davin, Delaney (Cynosure's Chief Commercial Officer) and a representative of Leerink met with representatives of Party A, Davin then met privately with a senior executive from Party A, who advised Davin that the previously mentioned antitrust risk should not deter Party A from making a proposal. On that same day, the Company and Party A executed a new confidentiality agreement containing standstill provisions, terminating upon public announcement of a merger by the Company.

37.     On January 6, 2017, Party A submitted a non-binding expression of interest to the

Company, indicating a value of $59.00 to $61.00 per share, payable in cash, and subject to a number of conditions, including satisfactory completion of due diligence. The expression of interest also noted that Party A would not be required to divest assets or litigate with regulatory authorities to obtain antitrust approvals.

38.     On January 10, 2017, after the Board authorized management to formally engage Leerink as the Company's financial advisor, representatives of Leerink indicated that the preliminary proposal did not likely represent Party A's best economic proposal. The Board then concluded that the offer price was insufficient to justify moving forward, and instructed Davin to reject the offer.

39.     On January 12, 2017, Party A submitted a revised non-binding expression of interest to the Company, indicating a value of $61.00 to $63.00 per share, payable in cash, and subject to the same conditions as the initial expression of interest.

40.     On January 13, 2017, during a teleconference among the Board, members of the Company's senior management, and representatives from Leerink and WilmerHale, Leerink noted that the financial terms of the revised expression of interest were within a range of valuations implied by its preliminary analyses. After further discussion, the Board concluded that the expression of interest was sufficiently attractive to justify providing Party A with access to certain due diligence materials and an opportunity to improve its valuation, but also suggested that Leerink and WilmerHale explore the interest of other potential bidders.

41.     On January 18, 2017, during a telephonic special meeting among members of the Company's senior management and representatives of Leerink and WilmerHale, Leerink proposed a list of 12 potential strategic acquirers, which included (in addition to Party A) Parent and Party B. After discussion, the Board approved the list of 12 potential bidders and directed management

to instruct Leerink to initiate outreach to the parties to assess their interest. Davin then presented a six year financial forecast ("Management Projections"), and after discussion of the latter, the Board approved Management Projections and directed management to provide them to Leerink and make them available to Party A and other potential bidders who sign a confidentiality agreement.

42.     From January 18, 2017 to February 8, 2017, Leerink contacted each of the 12 approved parties to assess their interest. On January 20, 2017, MacMillan of Parent indicated that Parent would be interested in conducting due diligence to determine whether it wished to make an acquisition proposal. On January 23, 2017, Parent negotiated a confidentiality agreement with the Company, which included a customary standstill provision. Party B also expressed willingness to discuss the opportunity, but was unable schedule a meeting with Leerink until January 31, 2017 due to the unavailability of key participants.

43.     On January 23, 2017, the first trading day after Bloomberg published an article reporting that the Company was weighing its strategic options and identifying Allergan, PLC ("Allergan") as a potential bidder, the Company's closing share price increased 6.6% to $46.75. The Recommendation Statement does not disclose any details pertaining to negotiations with Allergan, such as whether they made an offer to acquire the Company. It should be noted that Allergan announced on February 13, 2017 that it entered into a merger agreement with Cynosure's rival, ZELTIQ Aesthetics.

44.     On January 24, 2017, Parent and Party A were granted access to the Company's electronic data room to conduct due diligence, to which the Management Projections were added on January 25, 2017.

45.     On January 31, 2017, Parent submitted a non-binding expression of interest to the Company, indicating a value of $63.00 to $66.00 per share in cash and subject to a number of

conditions, including satisfactory completion of due diligence. The letter did not seek to limit Parent's obligations with respect to antitrust clearance.

46.     On February 1, 2017, after the Board met with members of senior management and representatives of Leerink and WilmerHale to discuss the results of outreach to potential bidders and Leerink's preliminary analysis comparing the proposals submitted by Parent and Party A, Leerink informed the financial advisors of Party A and of Parent that each of their clients must submit a markup of a merger agreement and final proposal on value by February 8, 2017. WilmerHale then sent a draft merger agreement to Party A's legal counsel and to Parent's legal counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), which did not include a proposal on the break-fee amount, provided that Parent would agree to divest assets if required in order to obtain antitrust approval, and reflected that all outstanding employee equity awards would be accelerated and paid out in cash based on the Offer Price.

47.     On February 7, 2017, Wachtell Lipton delivered a markup of the draft merger agreement to WilmerHale on behalf of Parent, which provided: (1) that the Company would pay a breakup fee of 4% of the equity value of the Company at the transaction price; and (2) that Parent would agree to divest assets to obtain antitrust approval as long as doing so would not have a material adverse effect, did not reflect any acceleration of outstanding employee equity awards except those held by directors, and tested several of the Company's representations and warranties without any materiality qualification as a closing condition.

48.     On February 8, 2017, after WilmerHale advised Wachtell Lipton that Parent should consider communicating a revised position on certain concerning issues, Parent submitted an updated non-binding expression of interest to the Company, indicating a value of $65.25 per share, payable in cash, along with an updated draft merger agreement, which, among other modifications,

added materiality qualifications to test several of the Company's representations and warranties as a closing condition. On that same day, MacMillan and Davin met privately for lunch to discuss potential integration issues.

49.     Also on that date, legal counsel to Party A delivered Party A's markup of the draft merger agreement, which: (a) included Party A's price proposal of $63.00 per share in cash; (b) contemplated a one-step merger rather than a tender offer; and (c) disclaimed any obligation on the Part of Party A to negotiate or agree to divestiture or other remedies to obtain antitrust clearance.

50.     Also on February 8, 2017, Party B submitted a non-binding preliminary expression of interest to the Company, indicating a value of $65.00 per share, payable in cash, and subject to a number of conditions, including satisfactory completion of due diligence.

51.     During a telephonic special meeting among the Board, members of senior management, and representatives of Leerink and WilmerHale on February 9, 2017, after discussion of the merger drafts submitted by Parent and Party A, the Board decided that Parent and Party A should each be encouraged to revisit their price and submit their "best and final" offer, along with a second round of markups of the merger agreement. During a discussion of Party B's proposal, when the Board asked Davin and Leerink whether they could encourage Party B to submit a higher bid on a similar timeline to those of Parent and Party A, Leerink noted that a higher bid would not be firm given that Party B had not started its due diligence, that identification of synergies would be a factor in any amended price proposal, that certain obstacles to achieving synergies existed, and that it was uncertain whether Party B would identify additional value through due diligence. Davin then recommended that the Company provide a confidentiality agreement to Party B and continue communications with them to keep them in the process, and the Board agreed.

52.     On February 10, 2017, WilmerHale sent a revised draft of the merger agreement to Party A's legal counsel and to Wachtell Lipton, which, among other things, provided for a 3% breakup fee based on the Company's equity value and reflected that all outstanding employee equity awards would be accelerated and paid out in cash based on the Offer Price.

53.     Later on February 10, 2017, Party A's CEO discussed Party A's position on antitrust remedies and value with Davin, at which time Davin stated that Party A's position that the antitrust risk was a low probability was unacceptable, and that Party A would need to raise its price to remain competitive.

54.     Also on February 10, 2017, the Company provided Party B with a confidentiality agreement. The Recommendation Statement fails to disclose whether Party B ever executed this confidentiality agreement, and if so, whether the agreement contained a standstill provision.

55.     On February 11, 2017, Party A's CEO informed Davin that Party A was unwilling to increase its price or concede its position on antitrust remedies.

56.     On February 12, 2017, MacMillan informed Davin that Parent was increasing its offer to $66.00 per share, which was the best price that Parent would be willing to offer.

57.     During a telephonic special meeting among the Board, members of senior management, and representatives of Leerink and WilmerHale on February 13, 2017, the Board concluded that Parent's offer was economically superior to any of the others in hand, and that it would not be possible to obtain a firm offer from Party B without significant delay, that the ZELTIQ announcement put the Company in a vulnerable position, and that significant delay might encourage Parent to consider revisiting the existing terms. Therefore, the Individual Defendants concluded that it was in the best interest to pursue an agreement with Parent as quickly as possible, and instructed management and WilmerHale to finalize the agreement with Parent. The Board also

advised Davin that he was now permitted to negotiate with Parent regarding employment arrangements for Company management.

58.     On February 14, 2017, the Board unanimously approved the Merger Agreement and recommended that stockholders of the Company tender their shares of Company Common Stock to Purchaser pursuant to the Offer to be conducted in accordance with the Merger Agreement. At approximately 6:30 a.m., Parent, Purchaser, and the Company executed and delivered the Merger Agreement, after which Parent and Company issued a joint press release announcing the transaction.

### The Conflicted Directors & Officers

59.     The Company's Board and senior management are conflicted because they stand to benefit financially from the Proposed Transaction in ways which the Company's public stockholders will not.

60.     As outlined in the tables below, upon the consummation of the Proposed Transaction, the Company's officers and directors will receive a large amount for their Company shares, restricted stock units, stock options, and performance units:

| Name | Number of Shares | Cash Consideration Payable in Respect of Shares |
|---|---|---|
| **Executive Officers** | | |
| Michael R. Davin(a) | 38,625 | $ 2,549,250 |
| Stephen J. Webber | — | — |
| Douglas J. Delaney | 15,438 | $ 1,018,908 |
| **Non-Employee Directors** | | |
| Brian M. Barefoot | 15,850 | $ 1,046,100 |
| Ettore V. Biagioni | 9,510 | $ 627,660 |
| William O. Flannery | 14,510 | $ 957,660 |
| Marina Hatsopoulos | 18,850 | $ 1,244,100 |
| Thomas H. Robinson | 14,514 | $ 957,924 |

| Name | Number of Company RSUs | Cash Consideration Payable in Respect of Company RSUs |
|---|---|---|
| **Executive Officers** | | |
| Michael R. Davin | 58,135 | $ 3,836,910 |
| Stephen J. Webber | 19,483 | $ 1,285,878 |
| Douglas J. Delaney | 25,599 | $ 1,689,534 |
| **Non-Employee Directors** | | |
| Brian M. Barefoot | 1,272 | $ 83,952 |
| Ettore V. Biagioni | 1,272 | $ 83,952 |
| William O. Flannery | 1,272 | $ 83,952 |
| Marina Hatsopoulos | 1,272 | $ 83,952 |
| Thomas H. Robinson | 1,272 | $ 83,952 |

| Name | Number of Vested Company Stock Options | Cash Consideration Payable in Respect of Vested Company Stock Options(a) | Number of Unvested Company Stock Options | Cash Consideration Payable in Respect of Unvested Company Stock Options(a) |
|---|---|---|---|---|
| **Executive Officers** | | | | |
| Michael R. Davin | 16,283 | $ 591,272 | 16,887 | $ 599,320 |
| Stephen J. Webber | — | $ — | — | $ — |
| Douglas J. Delaney | 7,876 | $ 285,995 | 8,167 | $ 289,847 |
| **Non-Employee Directors** | | | | |
| Brian M. Barefoot | 15,892 | $ 638,612 | — | — |
| Ettore V. Biagioni | 29,392 | $ 1,131,482 | — | — |
| William O. Flannery | 23,892 | $ 979,012 | — | — |
| Marina Hatsopoulos | 56,892 | $ 2,713,092 | — | — |
| Thomas H. Robinson | 31,392 | $ 1,222,162 | — | — |

| Name | Number of Company PSUs(a) | Cash Consideration Payable in Respect of Company PSUs |
|---|---|---|
| **Executive Officers** | | |
| Michael R. Davin | 194,824 | $ 12,858,384 |
| Stephen J. Webber | 23,180 | $ 1,529,880 |
| Douglas J. Delaney | 50,373 | $ 3,324,618 |

61.    Additionally, each officer stands to receive golden parachute compensation if he is terminated as a result of the Proposed Transaction, as outlined below:

| Name | Cash | Equity (1) | Perquisites/ Benefits (2) | Total Value |
|---|---|---|---|---|
| Michael R. Davin | $12,920,062 (3) | $17,294,614 | $ 41,963 | $30,256,639 |
| Douglas J. Delaney | $ 4,397,799 (3) | $ 5,303,999 | $ 42,207 | $ 9,744,005 |
| Stephen J. Webber | $ 1,825,781 (4) | $ 2,815,758 | $ 18,990 | $ 4,660,529 |
| Timothy W. Baker | — | $ 1,125,935 | — | $ 1,125,935 |

### *The Materially Incomplete Recommendation Statement*

62.    The Defendants breached their fiduciary duties to the Company's stockholders by causing the materially incomplete and misleading Recommendation Statement to be filed with the SEC on February 22, 2017. The Recommendation Statement omits material information that must be disclosed to enable Cynosure's stockholders to make an informed decision with respect to the Offer Consideration.

63.    More specifically, with respect to the background of the Proposed Transaction, the Recommendation Statement fails to disclose: (a) whether Davin had any communications with Parent about employment arrangements for Company management prior to the finalization of the

15

Merger Agreement; (b) details regarding negotiations with Allergan, including whether an acquisition proposal was made; and (c) details regarding negotiations with Party B, including whether Party B signed a confidentiality agreement, and if so, whether the agreement contained a standstill provision that would prevent them from making a superior offer.

64.     With respect to Management Projections and Leerink's financial analyses, the Recommendation Statement fails to disclose: (a) line item projections for metrics used to calculate non-GAAP measures; (b) stock-based compensation projections; (c) whether Leerink considered only the estimated upfront consideration when calculating the pricing multiples, and if so, why milestone payments were not included; (d) how the upfront consideration was estimated, as well as the reason for estimating the upfront payment; (e) the EBITDA multiples for the public companies  (and precedent transactions, if examined), which formed the basis for the terminal multiples selected by Leerink in its Discounted Cash Flow Analysis; (f) the projected EBITDA for years 2017-2022; and (g) the value and source of Weighted Average Cost of Capital ("WACC") assumptions.

## CLAIMS FOR RELIEF

### COUNT I
**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act**

3.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

4.     Defendants have filed the Recommendation Statement with the SEC with the intention of soliciting Cynosure stockholder support for the Proposed Transaction.  Each of the

Individual Defendants reviewed and authorized the dissemination of the Recommendation Statement, which fails to provide the material information referenced above.

5.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Cynosure, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).

6.     Specifically, and as detailed above, the Recommendation Statement violates Section 14(e) because it omits material facts concerning Management Projections, Leerink's financial analyses, as well as the background of the Proposed Transaction.

7.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Recommendation Statement is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Recommendation Statement, rendering the sections of the Recommendation Statement identified above to be materially incomplete and misleading.

8.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed tender if such misrepresentations and omissions are not corrected prior to the close of the Tender. Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable

powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

1.      Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

2.      The Individual Defendants acted as controlling persons of Cynosure within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Cynosure and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

3.      Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to the time the Recommendation Statement was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

4.      In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was

reviewed by the Board prior to voting on the Proposed Transaction.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Recommendation Statement.

5.      In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

6.      By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

7.      As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e), by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

8.      Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company: (i) adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for the Company's stockholders; and (ii) discloses the material information discussed above which has been omitted from the Recommendation Statement;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Directing defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

Dated: March 1, 2017

LEVI & KORSINSKY, LLP

_____

Stephanie A. Bartone (BBO #684270)
Shane T. Rowley
Ashling M. Soares
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (203) 992-4523
Fax: (212) 363-7171